UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
CRAIG BLESSING,                   :
                                  :
                 Plaintiff,       :
                                  :     02 Civ. 3874 (LMM)
        v.                        :     MEMORANDUM AND ORDER
                                  :
J.P. MORGAN CHASE & CO., J.P.     :
MORGAN FLEMING ASSET MANAGEMENT   :
(USA) INC., J.P. MORGAN           :
INVESTMENT MANAGEMENT, INC.,      :
CHASE FLEMING ASSET MANAGEMENT    :
(USA), INC.                       :
                                  :
                 Defendants.      :
---------------------------------X

McKENNA, D.J.

        Plaintiff Craig Blessing ("Blessing") brings this action

against defendants J.P. Morgan Chase & Co., J.P. Morgan Fleming

Asset Management (USA) Inc., J.P. Morgan Investment Management,

Inc., Chase Fleming Asset Management (USA), Inc. (collectively

"defendants") alleging age discrimination under the Age

Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. § 621

et. seq., New York State Human Rights Law ("NYSHRL") N.Y. Exec.

Law § 296, and New York City Human Rights Law ("NYCHRL") N.Y.

City Admin. Code § 8-107, and a violation Section 510 of the

Employee Retirement Income Security Act of 1974 ("ERISA"); 29

U.S.C. § 1140.

        Defendant now moves for summary judgment on all of

plaintiff's claims pursuant to Fed. R. Civ. P. 56.  For the

reasons set forth below, the motion for summary judgment is

granted in its entirety.

**Background**

A.  <u>Blessing at The Chase Manhattan Bank</u>

Blessing joined The Chase Manhattan Bank ("Chase") as a Vice President, Portfolio Manager ("PM"), and head of Emerging Markets Debt in 1996.  (Defendants' Local Rule 56.1 Statement, Dec. 17, 2004, ("Defs. 56.1 Stmt.") ¶¶ 5-6.)  At the time he joined Chase, he was 39 years old, had two Bachelor's degrees from the University of Kansas and a Master's degree in Business Administration and International Policy Studies from Stanford University.  (<u>Id.</u> ¶¶ 3-4.)  As a PM, his job description included managing bond portfolios, marketing investment products, presenting at board meetings, and managing client relationships.  (<u>Id.</u> ¶¶ 9-11, 29.)

Early in the year 2000, Blessing's responsibilities changed on two occasions.  (<u>Id.</u> ¶¶ 14-17.)  In January of 2000, there was a departmental restructuring during which Blessing was chosen for job elimination.  (<u>Id.</u> ¶ 15)  It was during this period that Blessing first became familiar with the Chase severance policy.  (Am. Compl. ¶¶ 11-13.)  As it turned out, however, Blessing was rehired by Chase, with no break in service, after a department head left Chase during the restructuring.  (Defs. 56.1 Stmt. ¶ 16.)  In March of 2000, Chase acquired Fleming Asset Management, which created additional responsibility for Blessing.  (<u>Id.</u> ¶ 17.)  After that acquisition, Blessing was responsible for

managing approximately $400 million in assets. (Affirmation of Marc A. Susswein, Mar. 18, 2005, ("Susswein Aff.") Ex. 14 at 62-63.) At one point during his tenure at Chase, Micropal, an independent company that rates investment funds, ranked Blessing's Chase Luxembourg-registered Emerging Markets Bond Fund fifth out of thirty-seven funds of its kind. (Plaintiff's Local Rule 56.1 Statement, Mar. 18, 2005, ("Pl. 56.1 Stmt.") ¶¶ 19-20.)

B.  Chase Merger with J.P. Morgan & Co.

1.  Business Model

In September 2000, Chase announced its intent to merge with J.P. Morgan & Co. ("J.P. Morgan"), and form J.P. Morgan Chase ("JPMC"). (Defs. 56.1 Stmt. ¶ 21.) Soon thereafter, the merging companies formed a merger integration team to examine both Chase and J.P. Morgan individually, and select the best business model and personnel for the merged entity. (Id. ¶ 22-23, 34.) With regard to the business model, Chase's Emerging Markets PMs handled both the investment and the client interface components of portfolio management. (Id. ¶ 29.) In contrast, J.P. Morgan had two types of portfolio managers, Alpha Portfolio Managers ("APMs"), which handled the fund investment component, and Client Portfolio Managers ("CPMs"), which handled the client interface component. (Id. ¶ 30.) The difference between the two companies' business models was due, in part, to the number, size, and nature of the clients and portfolios managed by each.

Blessing's department at Chase managed between $300 million and $500 million in assets (<u>id.</u> ¶ 25.), while the Emerging Markets department at J.P. Morgan managed over $5 billion in assets. (<u>Id.</u> ¶ 26.)  In view of the difference in size between the two companies, the merger integration team chose the J.P. Morgan business model for the newly merged company.  (<u>Id.</u> ¶¶ 32-33.)

    2.   Personnel

After choosing the J.P. Morgan business model, the merger integration team began selecting personnel to fill various positions within the new company.  (<u>Id.</u> ¶ 34.)  Since the J.P. Morgan Emerging Markets portfolio was so much larger than its Chase equivalent, the integration team decided that the current J.P. Morgan personnel could take on all of Chase's business, and require only a few Chase employees to manage the increased workload.  (<u>Id.</u> ¶ 39.)  The result was that the merger heavily favored J.P. Morgan employees over Chase employees in almost all positions at JPMC.  (<u>Id.</u> ¶¶ 74-77.)  Most notably, all twenty-one J.P. Morgan APMs were retained as JPMC APMs, while only three of the twenty-six Chase PMs were retained.  (<u>Id.</u> ¶¶ 70-71.)  The three Chase PMs offered APM positions were ages 47, 45, and 33 at the time they were offered those positions.  (<u>Id.</u> ¶ 78.)  Only three Chase PMs, including plaintiff, were offered CPM positions at JPMC.  (<u>Id.</u> ¶ 72.)  The two individuals other than plaintiff were under forty years-old.  (<u>Id.</u>)

In choosing new APMs, the integration team had direct supervisors in each company interview and rank their respective employees. (<u>Id.</u> ¶¶ 36-37.) One of the most highly ranked people for the JPMC Emerging Markets APM position was J.P. Morgan's Emerging Markets APM, Paul Dickson ("Dickson"). (<u>Id.</u> ¶ 43.) Dickson had a Bachelor of Arts degree in International Affairs from George Washington University, and Master of Arts degrees in both Economics and International Relations from Johns Hopkins University. (<u>Id.</u> ¶¶ 45-46.) Prior to joining J.P. Morgan, Dickson had worked as a Senior Emerging Markets Strategist for Lehman Brothers, and also as an Economist in Emerging Markets Research for Chase Securities. (<u>Id.</u> ¶¶ 49-50.) In his capacity as APM at J.P. Morgan, Dickson managed over $5 billion in assets. (<u>Id.</u> ¶ 39.) Dickson was chosen for the Emerging Markets APM position at JPMC, and Blessing was not. (<u>Id.</u> at ¶ 59.) However, Blessing was not considered for Dickson's position under the merger integration team's method used to fill the other positions. Instead, Dickson's supervisor, Michael Cembalest, unilaterally chose to keep Dickson in the APM position. (Susswein Aff. Ex. 14 at 61.) At the time of the merger, Dickson was 35 years old and Blessing was 43 years old. (<u>Id.</u> ¶¶ 1, 21, 55.)

C. <u>Severance Benefits</u>

One the benefits that Chase offered its employees at the

time Blessing joined the company in 1996 was severance pay.
(Affidavit of Melissa R. Gold, Dec. 17, 2004, ("Gold Aff.") Ex. K
at JPMC 000316.)  According to Article III, section 3.1 of the
Chase Severance Pay Policy, a person is eligible for severance
pay if that "individual's employment is involuntarily terminated
with an Employer because of . . . an elimination or re-assignment
of the job position or functions held or performed by the
Employee."  (Id. Ex. K at JPMC 000325.)  However, under section
3.2, the policy also states that an employee is ineligible for
severance pay

> if the [Plan] Administrator (or his or her
> delegates), in his or her sole discretion,
> determines that such Employee (i) has been
> offered another position or reassigned to
> perform other functions (whether or not such
> position or reassignment is accepted or
> comparable to the current position) by any
> [entity] with whom [Chase] has made
> arrangements for the employment of the
> Employee. . . .

(Id. Ex. K at JPMC 000326.)

The integration team eliminated Blessing's position when it
adopted the J.P. Morgan business model.  Therefore, Blessing
would have been eligible for severance benefits under section 3.1
of the Severance Pay Policy.  However, JPMC argues that Blessing
became ineligible for severance benefits under section 3.2 when
they offered him the CPM position.  (Defs. Supp. Mem. at 20.)

In January of 2001, Blessing learned that he was being
considered for the CPM position, and told his supervisor, Timothy

6

Neumann ("Neumann"), that he was not interested in that position. (Defs. 56.1 Stmt. ¶ 83.) After Neumann spoke to another supervisor, Mark Smith ("Smith"), about Blessing's response, Smith contacted Blessing to discuss the CPM position. (Id. ¶ 85.) Blessing reiterated to Smith that he was not interested in the CPM position. (Id. ¶ 86.) Nevertheless, the merger integration team ultimately decided that Blessing was the best candidate for the CPM position. (Id. ¶¶ 94-95.) In January of 2001, Gilbert Van Hassel, "head of fixed income globally for investment management," (Susswein Aff. Ex. 16 at 13), instructed Neumann to offer Blessing the CPM position in the hope that Blessing would accept that offer. (Id. ¶¶ 94-95.) Neumann subsequently offered Blessing the position. (Id.)

During the same time period, Blessing contacted James Casey, Chase's Human Resources representative, and requested an investigation to determine whether his former PM role and the CPM position were "comparable." (Id. ¶ 99.) Kimberly McGuire, an Employee Relations specialist in Human Resources, performed the investigation and concluded that the positions were comparable. (See id. ¶ 103.) Casey notified Blessing of that determination via email. (Gold Aff. Ex. O.) Casey also notified Blessing that his failure to accept the CPM position would result in a termination without severance benefits. (Defs. 56.1 Stmt. ¶ 110.) On February 27, 2001, Blessing failed to report to work in

his role as CPM and was terminated for misconduct.  (<u>Id.</u> ¶¶ 111-14.)

### D.  <u>Blessing's Legal Actions</u>

On October 8, 2001, Blessing filed an age discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). (<u>Id.</u> ¶ 129.)  The EEOC dismissed Blessing's case and issued him a Right to Sue letter on February 19, 2002.  (<u>Id.</u> ¶ 130.) Thereafter, plaintiff filed the instant lawsuit on May 21, 2002. (<u>See</u> Am. Compl.)  Defendants filed a motion to dismiss plaintiff's ERISA §§ 510 and 512 claims pursuant to Fed. R. Civ. P. 12(b)(6), which this court granted on February 24, 2003.  <u>See</u> <u>Blessing v. J.P. Morgan Chase & Co.</u>, No. 02 Civ. 3874, 2003 WL 470338 (S.D.N.Y. Feb. 24, 2003).  This Court dismissed the § 512 claim with prejudice, and dismissed the § 510 claim with leave to replead.  <u>Id.</u> at *3.  After plaintiff filed an amended complaint, the parties conducted discovery and defendants filed the instant motion for summary judgment on December 17, 2004.

## Discussion

Blessing asserts two legal claims arising from this set of facts.  First, he claims that JPMC discriminated against him based on his age when it chose Paul Dickson, age 35, over Blessing, age 43, for an APM position, and left Blessing with a CPM position.  Second, he claims that JPMC intentionally deprived him of his severance benefits by offering him a CPM position that

JPMC knew he would refuse.

A.   Standard of Review

Summary judgement "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. In weighing a motion for summary judgment, ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. See Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). However, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56) (emphasis omitted). "[C]onclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d

Cir. 1996) (citations omitted).

Although courts are understandably cautious about granting
summary judgment in cases where motive, intent or state of mind
is at issue, <u>Montana v. First Fed. Sav. and Loan Ass'n of</u>
<u>Rochester</u>, 869 F.2d 100, 103 (2d Cir. 1989), "the salutary
purposes of summary judgment -- avoiding protracted, expensive
and harassing trials -- apply no less to discrimination cases
than to . . . other areas of litigation." <u>Meiri v. Dacon</u>, 759
F.2d 989, 998 (2d Cir. 1985). Consequently, once the moving
party has met its burden, the nonmoving party in a discrimination
action must come forward with evidence sufficient for a
reasonable fact-finder to return a verdict in his or her favor.
<u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

B.   <u>Blessing's Age Discrimination Claims</u>[1]

Under the ADEA, it is "unlawful for an employer . . . to
fail or refuse to hire or to discharge any individual or
otherwise discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's age." 29 U.S.C. § 623(a)(1). In
the absence of direct evidence of discrimination, the Supreme

---

[1] Blessing's age discrimination claims under state and city
law are subject to the same analysis as his ADEA claim. <u>See</u>
<u>Norville v. Staten Island Univ. Hosp.</u>, 196 F.3d 89, 95 (2d Cir.
1999). Therefore, they are not separately addressed in this
opinion.

Court has analyzed age discrimination claims supported by circumstantial evidence under the McDonnell Douglas burden-shifting framework. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). Under the McDonnell Douglas framework, a plaintiff must first make out a *prima facie* case of discrimination, then the burden shifts to the defendants to provide a legitimate, nondiscriminatory reason for the action of which plaintiff complains, and finally, the burden shifts back to the plaintiff to demonstrate that defendants' proffered reason was merely a pretext for illegal discrimination. See id.

1.   Prima Facie Case of Age Discrimination

To make out a prima facie case of age discrimination, a plaintiff must demonstrate that: (i) at the time of the incident, he was a member of the class of persons protected under the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)), (ii) he was otherwise qualified for the APM position, (iii) he suffered an adverse employment action, and (iv) that the circumstances surrounding the action give rise to an inference of age discrimination, "such as the fact that the plaintiff was replaced by someone 'substantially younger'". Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996)). The plaintiff's *prima facie* burden is "minimal" or "de minimis." Zimmerman v. Assocs. First Capital Corp., 251 F.3d

376, 381 (2d Cir. 2001).

There is no dispute concerning Blessing's membership in the protected class. Additionally, there is no question that Blessing's qualifications for the position meet his burden at the *prima facie* case stage of the McDonnell Douglas framework. Defendants assert that Blessing was not the most qualified applicant for the APM position. That argument may apply to defendants' legitimate reason for its decision, but it is not the standard plaintiff must meet in order to make out a *prima facie* case. See, infra, Part 3; (Defendants' Memorandum of Law in Support of Its Summary Judgment Motion, Dec. 17, 2004, ("Defs. Supp. Mem.") at 9.) At this point in the analysis, it is sufficient that Blessing's education, work experience, and performance at Chase qualified him for the APM position. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258-59 (1981) (explaining that the *prima facie* case portion of the McDonnell Douglas test does not require either party to show that one person was more qualified for a position than another).

> a.  Circumstances Giving Rise to an Inference of
>     Age Discrimination

Similarly, plaintiff claims that the elimination of his position at Chase and transfer to the CPM position constituted an adverse employment action.[2] (Plaintiff's Memorandum of Law in

---

[2] Plaintiff asserts the elimination of the PM position and transfer to the CPM position as the adverse employment action.

Opposition to Defendants' Motion for Summary Judgment, Mar. 18, 2005, ("Pl. Opp'n Mem.") at 20.) However, plaintiff does not assert, or present any evidence indicating, that the elimination of his position arose under circumstances giving rise to an inference of age discrimination. See Abrahamson v. Bd. of Educ., 374 F.3d 66, 71 (2d Cir. 2004). More appropriately, Blessing also contends that he was denied a transfer from his PM position at Chase to the APM position at JPMC, which left him with the CPM position. Plaintiff asserts that since he was denied the APM position in favor of Paul Dickson, who was seven years younger than Blessing and not in the protected class,[3] there are sufficient facts to allow a jury to infer age discrimination. The fact that Blessing was a member of the protected class, and

---

(Pl. Opp'n at 20-23.) He does not allege discrimination based on failure to hire or rehire.

[3] The Court notes that the Seventh Circuit Court of Appeals has held that the term "'[s]ubstantially younger' [used in the O'Connor prima facie case standard] means at least a ten-year age difference; any age disparity less than ten years is 'presumptively insubstantial.'" Fisher v. Wayne Dalton Corp., 139 F.3d 1137, 1141 (7th Cir. 1998) (citation omitted); see Richter v. Hook-SupeRx, Inc., 142 F.3d 1024, 1029 (7th Cir. 1998) (holding that a seven-year age difference is a "presumptively insubstantial gap"); Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 892-93) (7th Cir. 1997) (placing a different burden on ADEA plaintiff claiming he or she was replaced by a person less than ten years younger). However, those courts made exceptions based on the circumstances of those specific cases. Hartley, 124 F.3d at 893. Since the ADEA's protected class includes persons at least 40 years old, and Blessing contends that he, at the age of 43, was replaced by a 35-year-old (person outside of the protected class), this Court will not presume that the seven-year age difference is insubstantial.

was denied a position in favor of a person not of that class is sufficient to meet the low threshold at the *prima facie* case stage of this Court's analysis.

b. Adverse Employment Action

As for the third element of plaintiff's *prima facie* case, defendants contend that Blessing did not suffer an adverse employment action. (Defs. Supp. Mem. at 14.) The Second Circuit has held that "a plaintiff may suffer an 'adverse employment action' if she [or he] endures a 'materially adverse change in the terms and conditions of employment.'" Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)(citing Torres v. Pisano, 116 F.3d 625, 632-33 (2d Cir. 1997)). "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or alteration of job responsibilities." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations omitted). "'[A]n employee's subjective dissatisfaction' with his or her current position, or subjective desire for the position denied him or her, is not enough to constitute an adverse employment action." Ash v. N.Y. State Office of Court Admin., No. 00 Civ. 9849, 2005 WL 287416, at *4 (S.D.N.Y. Feb. 2, 2005) (quoting Meckenberg v. N.Y. City Off-Track Betting, 42 F. Supp. 2d 359, 378 (S.D.N.Y. 1999)). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a

14

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal citations omitted).  "[B]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'"  Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).

The issue here is whether being denied the APM position was an adverse employment action.  Defendants claim that Blessing did not suffer an adverse employment action because he was offered the CPM position, which "would have been located in New York, would have been a lateral move, and would have [had] no change in title, compensation or advancement potential."  (Defs. Supp. Mem. at 14.)  Blessing does not refute defendants' factual assertions, but contends that the CPM position was "'materially less prestigious, materially less suited to [his] skills and expertise, or materially less conducive to career advancement.'"  (Pl. Opp'n Mem. at 20) (quoting Galabya, 202 F.3d at 641.)  Specifically, Blessing contends that his career potential would have suffered because (1) the APM position gives him authority to control portfolio fund investing while the CPM position involves monitoring the investments of individual clients, (2) the APM

15

position is more suited to his skills, and (3) the failure to maintain a current investment record would have made it more difficult to obtain an APM position in the future. (Pl. Opp'n Mem. at 20-21.) "[T]herefore," Blessing contends, "[t]he loss of investment authority combined with the loss of opportunity for advancement as an APM . . . constituted an adverse employment action." (Id. at 21.) However, Blessing does not present any evidence to indicate that the CPM position is, objectively, materially less prestigious or materially less suited to his general career advancement. Instead, he analyzes the similar APM and CPM positions - both of which require monitoring the market and evaluating the most favorable allocation of assets - and focuses on minute distinctions between their descriptions, namely an APM's authority to dictate how portfolio funds are invested. (See id. at 20-21.) These distinctions only evidence Blessing's subjective desire to have the APM position based on his personal career goals. An employer's failure to meet such a subjective desire, alone, does not constitute a "materially adverse" change in the conditions of employment. See Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002) (stating that "not everything that makes an employee unhappy is an actionable adverse action"). Since Blessing has failed to produce any evidence that he suffered a materially adverse employment action, he has failed to make out a *prima facie* case.

## 2. Defendants' Legitimate, Nondiscriminatory Reason for Failing to Promote Blessing

Even if plaintiff had made out a *prima facie* case of age discrimination, defendants proffer legitimate, nondiscriminatory reasons for terminating plaintiff's position and retaining Dickson in the APM position. If plaintiff had made out a *prima facie* case of age discrimination, the burden would shift to defendants to "'clearly set forth, through the introduction of admissible evidence,' reasons for [their] actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 255). "[A]lthough the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Hicks, 509 U.S. at 518 (quoting Burdine, 450 U.S. at 253).

In the instant case, defendants primarily note that Blessing's position was eliminated in the course of the merger for a legitimate business purpose, i.e., consolidating the JPMC workforce by eliminating duplicative positions common to both J.P. Morgan and Chase. Likewise, defendants assert legitimate reasons for choosing to retain Dickson as an APM, rather than replace him with Blessing. Defendants contend that they kept

17

Dickson in the APM role because he was the most qualified person for that position, was familiar with the J.P. Morgan system adopted by JPMC, and managed the J.P. Morgan Emerging Markets Portfolio, which comprised the bulk of the post-merger JPMC Emerging Markets Portfolio. (Defs. Supp. Mem. at 4.) Michael Cembalest, JPMC's Chief Investment Officer, had hired Dickson to work at J.P. Morgan more than a year prior to the merger. (Susswein Aff. Ex. 14 at 5:24-6:1, 61.) In his role as APM of the Emerging Markets Portfolio, Dickson managed approximately $5 billion in assets, over ten times the amount of assets Blessing managed at Chase. Since Dickson was recently selected for the position, knew the J.P. Morgan system, and was successful during his year as APM, JPMC chose to leave him in his APM position. The proffered reasons are sufficient to shift the burden back to plaintiff at this stage.

### 3. Plaintiff's Pretext Argument

Plaintiff asserts that defendants' proffered reasons for keeping Dickson in the APM position were merely a pretext for unlawful age discrimination. In support of that contention, plaintiff asserts that (1) Blessing was more qualified for the APM position than Dickson, (2) the process for choosing each of the other positions was not used in selecting the JPMC Emerging Markets APM, and (3) defendants engaged in a pattern of terminating older employees. (Pl. Opp'n Mem. at 22-24.)

a.    Whether Blessing was More Qualified

Although plaintiff claims that he was more qualified for the JPMC APM position, Dickson managed a portfolio ten times the size of Blessing's.  (Susswein Aff. Ex. 14 at 61-75.)  Moreover, even though Micropal ranked one of Blessing's Chase funds highly, that rating did not take the size of the fund into account.  (See Id. Ex. 20 at 72-73.)  Plaintiff contends that the size of the fund is pretextual because JPMC later created a co-head APM position to help manage the large fund, but did not consider Blessing for that role at the time of the merger.  (Pl. Opp'n Mem. at 23.)  However, the co-head position was created long after the merger, when Dickson left the APM position.  (Id.)  Creating a new position was a business decision that the merger integration team apparently chose not to make at the time of the merger, and "it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal."  Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988) (citing Burdine, 450 U.S. at 259, and Meiri, 759 F.2d at 995).  The team's decision is indicative of the merger integration team's confidence in its chosen personnel structure and its confidence in Dickson's abilities, but not of discrimination against Blessing based on his age.   Moreover, at the time of the merger, Blessing himself admitted that "[Dickson's group at J.P. Morgan] manage[d] 3 to 5 billion in

emerging markets depending on the day . . . . [J.P. Morgan had] a great team in place, and it work[ed] just fine." (Susswein Aff. Ex. 20 at 132-35.) Therefore, failing to create a new co-head APM role for him does not indicate discrimination.

Finally, a comparison of the two men's resumes certainly fails to evidence that Blessing was more qualified for the APM position. Each of them has a graduate degree from a reputable institution, and has had prior experience in various areas of investment management. Taken together, these factors do not indicate that Blessing is more qualified for the APM position, and thus fail to raise an issue of fact as to whether defendants' proffered legitimate reasons for keeping Dickson in his position were pretextual.

### b. Dickson Chosen Outside of Procedure

Next, the fact that the merger integration team did not evaluate candidates for the Emerging Markets APM position according to its own selection procedure also fails to raise an issue of fact with regard to pretext. First, as previously discussed, Dickson managed funds that were an order of magnitude greater than those Blessing managed. Second, Dickson's internal rating was much higher than Blessing's. Plaintiff provides a memo from Gilbert Van Hassel to Lynn Avitabile and James P. Casey titled "Proposed Headcount Reduction Plan for Fixed Income." (Susswein Aff. Ex. 7.) The memo contains data on employees from

both J.P. Morgan and Chase, and includes a section on APMs. (Id. at JPMC 000162-63.) Within the memo is a chart rating all of the employees being considered for APM positions on a five-point scale (one being the most favorable and five the least favorable). (Id.) The chart includes categories labeled "Market knowledge and alpha creation skills for both dedicated and asset allocation products," "Communication, marketing and client retention," "Teamwork," "Management and people development," and "Development of risk management analytics and other systems customized for sector specifics." (Id.) On that chart, Dickson has an overall rating of 1.4, while Blessing has a less favorable overall rating of 2.2. (Id.) There are forty-nine people listed on the chart, and Dickson's rating is tied for seventh, while Blessing's rating is tied for thirty-first. (Id.) The only category in which Blessing had a higher ranking than Dickson is "Communication, marketing and client retention." (Id.) Therefore, the data the committee would have used in evaluating Blessing and Dickson for the APM position objectively favored Dickson. Plaintiff has offered no evidence tending to show that age was a factor in the decision to retain Dickson.

<blockquote>c. Merger Retention Statistics</blockquote>

Finally, plaintiff alleges a pattern of age discrimination by JPMC. (See Susswein Aff. Ex. 7 at JPMC 000162-63.) Plaintiff presents a table from the Proposed Headcount Reduction memo that

details the ages of employees before and after the merger, (see id. Ex. 7 at JPMC 000161), and argues that it evidences a pattern of age discrimination. Plaintiff specifically points to the decrease in the amount of people over age 40, which went from 36% before the merger to 31% after. (See id.) However, in view of other evidence, the circumstantial statistical evidence from the chart is not probative of discrimination or pretext. Preliminarily, it must be noted that this evidence is not at all probative in Blessing's particular case, because he was retained post-merger and chose not to show up to work at the CPM position. Hollander v. Am. Cyanamid Co., 172 F.3d 192, 202 (2d Cir. 1999) (affirming a district court's conclusion that a plaintiff's statistical evidence was not relevant). Thus, even if the statistics evidence a pattern of discrimination, Blessing has failed to show that he was adversely affected by that discriminatory practice. See, e.g., Santiago v. Comm. of City Marshals, No. 84 Civ. 3984, 1987 WL 7374, at *5 (S.D.N.Y. Feb. 23, 1987) (stating that "statistics" indicating race and gender disparities in hiring "[we]re irrelevant to plaintiff's case since the [prospective employer] approved her application"). In order to raise a material issue of fact, plaintiff must present evidence that is relevant to the issue in more than a speculative or tangential sense. See Kulak, 88 F.3d at 71.

Assuming, arguendo, that the statistics are relevant, they

still fail to raise an issue of fact in view of all of the evidence. Courts have long recognized that "statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.'" Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 995 n.3 (1988) (quoting Teamsters v. United States, 431 U.S. 324, 340 (1977)). Here, Blessing asserts that there was "a post-merger decline by 5% in the number of people employed in the investment management division who were over 40 years of age and a similar decline for those employees over 50 years of age." (Pl. Opp'n Mem. at 22.) The raw numbers indicate that the investment management division was composed of 117 people before the merger. (Susswein Aff. Ex. 7 at JPMC 000161.) while the number of people "Over 40" went from 41 to 30, the number of people "Under 40" only went from 74 to 68. (Id.) These numbers indicate that the "pattern of age discrimination" Blessing alleges is based on JPMC employing eleven fewer people over age 40, and only six fewer people under age 40, after the merger. While the numbers alone might indicate that a disproportionate number of people over age 40 were no longer employed post-merger, defendants present at least two points that challenge the causal relationship between the raw numbers and discrimination in this case. See Hollander, 172 F.3d at 203 (finding that an "inference of discrimination solely on the basis of the raw numbers is impermissible in the absence

of any attempt to account for other causes of the age" disparity).

Most notably, "all of the [J.P. Morgan] APMs who were over 40 were retained in the integrated firm." (Defendants' Reply Memorandum, May 13, 2005, ("Defs. Reply") at 4.) Second, at least two Chase PMs who were over 40 at the time of the merger were offered APM positions at JPMC, while at least two Chase PMs who were under 40 at the time of the merger were offered a CPM position, as was Blessing. (Id.; Susswein Aff. Ex. 7 at JPMC 000159-61.) Only three Chase PMs from Blessing's group were offered APM positions, and two of them were over 40. If the tables Blessing presents indicate any "pattern" of unequal treatment, it is based on previous employment - favoring former J.P. Morgan employees -- not age.

Additionally, Blessing presents reasons that at least two of the Chase APMs that were over 40 did not continue with JPMC. In his argument concerning his ERISA claim, Blessing gives examples of two employees, over age 40, who asked to have their jobs eliminated because they wanted to change careers. (Susswein Aff. Ex. 17 at 27-30, 79-81, 122.) Each of them were eliminated and received severance. Given these examples as to why other people over the age of forty might decide to discontinue their employment post-merger, Blessing fails to raise an issue of fact as to pretext.

Therefore, defendants' summary judgment motion is granted on Blessing's age discrimination claims.

C.    ERISA § 510 Claim[4]

Blessing claims that defendants violated ERISA § 510 (29 U.S.C. § 1140), when they offered him the CPM position, despite the fact that he told them that he did not want that position. This Court summarized that assertion in its Feb. 24, 2003 Memorandum and Order, and "ma[de] no finding as to whether [it] would even be a viable theory." Blessing, 2003 WL 470338 at *3 n.2.  Faced with this theory once again, the Court must deal with it in the context of a summary judgment motion.

"Congress enacted ERISA in order to protect 'participants in employee benefits plans and their beneficiaries' by mandating disclosure of certain plan information, 'establishing standards of conduct, responsibility, and obligation for fiduciaries,' and enabling participants aggrieved by violations of ERISA's provisions to sue in federal court." Criscuolo v. Joseph E. Seagram & Sons, Inc., No. 02 Civ. 1302, 2003 WL 22415753, *5 (S.D.N.Y. Oct. 21, 2003) (quoting 29 U.S.C. § 1001(b)).  ERISA §

---

[4] Defendants' "Point IV" in their Supporting Memorandum challenges the validity of the employer as a defendant in an ERISA case.  This Court previously dismissed one of the claims defendants address, see Blessing, 2003 WL 470338 at *3, and the ERISA § 510 claim appears to be proper under the language of that statute and the decisional law in this circuit.  See Swanson v. U.A. Local 13 Pension Plan, 779 F. Supp. 690, 701 (W.D.N.Y. 1991), aff'd 953 F.2d 636 (2d Cir. 1991).

510 makes it "unlawful for any person to discharge . . . or discriminate against [an employee benefit plan] participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employer's] plan, [ERISA], or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140 (2005). Since ERISA § 510 focuses on the intent of the person interfering with an employee's attainment of benefits, cases in which a plaintiff has direct evidence of such intentional interference are rare, and most plaintiffs rely on circumstantial evidence. When an ERISA § 510 plaintiff has only circumstantial, as opposed to direct, evidence of an employer's intent to interfere with benefits, the Second Circuit applies the McDonnell Douglas burden-shifting framework to ERISA § 510 claims. See Dister, 859 F.2d at 1112. Thus, Blessing must make out a *prima facie* case of intentional interference by showing that he was (1) a member of the protected class, i.e., an employee who had an opportunity to attain rights through an ERISA-covered benefit plan, (2) qualified for his position, and (3) discharged under circumstances giving rise to an inference that the purpose of said discharge was to prevent the attainment of benefits. See Id. at 1114-15. Once Blessing makes out a *prima facie* case, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for his termination. See id. at 1115. Finally, the burden shifts back

26

to Blessing to demonstrate that the reason defendants articulated was merely a pretext for unlawful discrimination.  Blessing's "evidence must -- at a minimum -- create a genuine issue of fact as to [defendants'] offered reasons or as to a discriminatory motive."  Id.

### 1. *Prima Facie* Case

There is no dispute as to (1) Blessing's membership in the protected class, or (2) his qualification for the PM, APM, and CPM positions.  However, there is a dispute as to whether he was discharged or discriminated against under circumstances giving rise to an inference of intentional interference with his ability to collect severance pay.

To make out a *prima facie* case here plaintiff must show that he was discharged under circumstances giving rise to an inference of discrimination, or that defendants committed a discriminatory act against him with the intent to interfere with his attainment of severance pay.  It is clear from the facts that Blessing was not actually "discharged" under circumstances giving rise to an inference of discrimination.[5]  Therefore, the plaintiff must

---

[5] The elimination of Blessing's PM position during the course of the merger does not give rise an inference of intentional interference with his ability to collect severance pay, because that job elimination was the event that would have made him eligible for severance pay in the first place.  (See Gold Aff. Ex. K at JPMC 000325 (Art. III, § 3.2).)  Therefore, plaintiff asserts that the termination of Blessing's employment on February 28, 2001 is the event that gives rise to an inference of intentional interference with Blessing's benefits.  (Pl. Opp'n

demonstrate that defendants discriminated against him in violation of ERISA § 510.  In cases where entitlement to severance pay is in dispute, courts first look to the language of the severance policy at issue.  <u>See</u> <u>Boss v. Advanstar Communications, Inc.</u>, 911 F. Supp. 109, 111 (S.D.N.Y. 1995).  The Chase severance policy, entitled an employee to severance pay, <u>inter alia</u>, when the employee's job was eliminated.  (Gold Aff. Ex. K at JPMC 000325)  However, section 3.2 of the policy states that such an employee will become ineligible for severance pay

> if the [Plan] Administrator (or his or her delegates), in his or her sole discretion, determines that such Employee (i) has been offered another position or reassigned to perform other functions (<u>whether or not such position or reassignment is accepted or comparable to the current position</u>) by any [entity] with whom [Chase] has made arrangements for the employment of the Employee. . . .

(<u>Id.</u> Ex. K at JPMC 000326) (emphasis added.)  That language indicates that once Blessing's job was eliminated he became eligible for severance pay, but he would become ineligible for it if JPMC offered him a position.  The issue here is whether defendants, in view of the Chase severance plan, violated ERISA § 510 by offering Blessing the CPM position.

On the one hand, plaintiff argues that since he told JPMC he

---

Mem. at 11.)  However, that termination did not occur under circumstances giving rise to an inference of discrimination because Blessing, on his own initiative, chose not to report to work and was terminated for his insubordinate absence.

did not want the CPM position, they intentionally interfered with his right to attain severance benefits when they subsequently offered him the job. Under plaintiff's proposed interpretation of ERISA § 510 as it applies to the Chase severance plan, any time an employee's job is eliminated and that employee informs his or her employer that he or she does not want another position, any offer from that employer for continued employment violates ERISA § 510. (<u>See</u> Pl. Opp'n at 11-14.) The problem with that interpretation is that it contains is no act of discrimination as required by § 510. Section 510 requires more than interference with an employee's attainment of benefits. The interfering employer must "<u>discharge, discipline . . . or discriminate against</u> a participant . . . for the purpose of interfering with the attainment" of benefits. 29 U.S.C. § 1140 (emphasis added). This Court will not hold that an offer of employment, regardless of its nature, is an act of discrimination in violation of § 510 simply because it prevents the employee from attaining severance pay.

On the other hand, defendants look to the terms of the Chase severance plan, and argue that according to the plan's terms Blessing would be ineligible for benefits regardless of what position they offered him. (<u>See</u> Defs. Supp. Mem. at 21.) Defendants claim that since the plan makes Blessing ineligible for severance pay once he has been offered a position "whether or

not such position . . . is accepted or comparable to the current position," then there is no position they could offer him that would violate ERISA § 510.  However, defendants' position would allow companies to freely discriminate and avoid ERISA § 510 by altering the language of their benefits plans.  This Court will not hold that an offer of employment, regardless of its nature, cannot constitute an act of discrimination under ERISA § 510 simply because the plan language makes the employee ineligible for severance pay regardless of whether the position offered and the employee's prior position are comparable.

In Boss v. Advanstar, the Court dealt with parties who had similarly divergent arguments concerning a severance policy.  911 F. Supp. at 109.  That case involved Donna Boss ("Boss"), a magazine editor whose magazine was sold by her employer, Advanstar, to another company.  Id. at 110.  Her severance plan with Advanstar was similar to the Chase policy in that it offered a severance benefit, but employees became ineligible for it "when a department, division or subsidiary [was] sold and the employee [was] offered continued employment by the buyer."  Id.  Boss was offered an editor position with the new company, but still sought severance from Advanstar under its plan.  Id.  She argued that the phrase "continued employment" meant that she was entitled to "comparable" employment.  Id. at 111.  In analyzing the meaning of "continued," the Court concluded that "continued" implied the

persistence of a previously existing condition, and entitled Boss to "comparable" employment. Id. at 111. Boss's salary with the new company was slightly higher, her vacation time was identical, and her insurance and other benefits were substantially similar. Id. at 110. However, she complained that the new company did not offer severance pay. Id. at 111-12. The Court found that since the "nature, terms and conditions she was offered by [the new company], taken as a whole, were reasonably comparable to those of her employment with Advanstar prior to sale," she was not entitled to severance pay. Id. at 112.

In the instant case, the plan language expressly attempts to eliminate the possibility that a position offered to the eligible employee is required to be comparable. Such language may run afoul of other aspects of the law applicable to ERISA cases. First, this language could render the severance benefit illusory, which certainly does not comport with ERISA's purposes. See, e.g., 29 U.S.C. § 1001(b) (2005) (outlining ERISA's purposes which include protecting "the interests of participants in employee benefits plans" and "establishing standards of conduct, responsibility, and obligation for fiduciaries" of employee benefit plans). Second, there may be a set of facts under which the position offered to the eligible employee will amount to

discrimination or even a "constructive discharge."[6]  As
defendants interpret the plan, they could avoid paying severance
if, for example, a former $300,000 a year full-time PM (Susswein
Aff. Ex. 20 at 39:16-21) "were offered occasional employment [by
JPMC] as a janitor at the minimum wage."  Boss, 911 F. Supp. at
112.  At some point, such an offer may constitute discrimination
or a constructive discharge under ERISA § 510.

However, this Court does not need to reach those issues,
because offering Blessing a comparable position under these facts
is not discrimination.  A comparison between the PM and CPM
positions demonstrates that the "nature, terms and conditions
[Blessing] was offered by [JPMC], taken as a whole, were
reasonably comparable to those of" his PM position at Chase.  As
a CPM Blessing would have continued to work in New York, earn the

_____

        [6]  "Under the constructive discharge doctrine, an employee's
reasonable decision to resign because of unendurable working
conditions is assimilated to a formal discharge for remedial
purposes."  Pa. State Police v. Suders, 124 S. Ct. 2342, 2351
(2004).  Thus, a constructive discharge could be a "discharge"
under ERISA § 510.  Courts in this circuit and others have
previously dealt with constructive discharge issues in ERISA
cases.  See Terry, 336 F.3d at 151; Garratt v. Walker, 164 F.3d
1249, 1255-56 (10th Cir. 1998); Joyce v. RJR Nabisco Holdings
Corp., 126 F.3d 166, 177 (3d Cir. 1997); Lojek v. Thomas, 716
F.2d 675, 680 (9th Cir. 1983); Criscuolo, 2003 WL 22415753, at
*8.  As those cases make clear, Congress adopted ERISA § 510
with "constructive discharge" in mind.  See Lojek, 716 F.2d at
681 ("Discipline and discrimination can be so unpleasant as to
amount to a constructive discharge, a term used by the National
Labor Relations Board") (citing 119 Cong. Rec. 30374 (1974)).  It
is clear from the facts of the instant case that Blessing could
not present an issue of fact to support an assertion that he was
constructively discharged.

same salary, have the same potential for advancement, and maintain his Vice-President title.  (Defs. 56.1 Stmt. ¶¶ 68-69.)  Therefore, Blessing was offered a comparable position, and offering him a comparable position under these circumstances certainly does not amount to discrimination.  Since Blessing has failed to evidence a discharge or act of discrimination, he has failed to make out a *prima facie* case of intentional interference with his attainment of benefits.

## Conclusion

Blessing failed to make out a *prima facie* case of age discrimination under the ADEA because he showed no evidence that he suffered an adverse employment action.  Even if he had made out a *prima facie* case, he failed to raise an issue of fact with regard to whether defendants' proffered legitimate reason for his discharge was pretextual.  Plaintiff also failed to make out a *prima facie* case of intentional interference with his attainment of severance pay under ERISA § 510 because he produced no evidence indicating that defendants discharged or discriminated against him with the intent to interfere with his attainment of benefits.  For the foregoing reasons defendants' motion for summary judgment is granted in its entirety.

The Clerk will enter judgment dismissing the case.

So Ordered.

Dated:  August 3, 2005
        New York, New York

Lawrence M. McKenna
U.S.D.J.